IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SendSig, LLC, | |
| Plaintiff, | The Honorable J. P. Boulee |
| - vs. - | No. 1:19-cv-03733-JPB |
| Square, Inc., | |
| Defendant. | |

## BRIEF IN SUPPORT OF SQUARE, INC.'S MOTION TO DISMISS

*Of counsel*:

Theodore J. Angelis, *p.h.v. pending*
*theo.angelis@klgates.com*
Elizabeth J. Weiskopf, *p.h.v. pending*
*elizabeth.weiskopf@klgates.com*
Nicholas F. Lenning, *p.h.v. pending*
*nicholas.lenning@klgates.com*
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580
(206) 370-6006 (fax)


October 15, 2019

Todd E. Jones (No. 403925)
*tjones@taylorenglish.com*
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
(770) 434-6868
(770) 434-7376 (fax)

Counsel for Defendant
Square, Inc.

# TABLE OF CONTENTS

I.     Introduction..................................................................................................1

II.    Statement of Facts.......................................................................................3

       A.    The Parties..........................................................................................3

       B.    The '249 Patent ..................................................................................4

III.   The '249 Patent's Claims Are Not Eligible for Patent Protection Under the
       Supreme Court's Two-Step *Alice* Test. ........................................................7

       A.    Step One: The '249 Patent is Directed to the Abstract Idea of Sending
             and Receiving Handwritten Messages over a Network. ....................10

       B.    Step Two: The Claims Lack Any "Inventive Concept" That Is
             Significantly More than the Abstract Idea Itself. ..............................14

             i.    The individual elements do not add an "inventive concept"
                   because each involves well-understood, routine, and
                   conventional activity. ...............................................................15

             ii.   The ordered combination fails to add anything significant. .....18

IV.    Square's Point of Sale System Does Not Infringe the '249 Patent. .............20

V.     Conclusion .................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) .....................................................................9, 18

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   890 F.3d 1354 (Fed Cir. 2018) ...........................................................................9

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) ........................................................................11

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)...............................................................2, 7, 8, 13, 14, 17

*Am. Axle and Mfg., Inc. v. Neapco Holdings LLC*,
   __ F.3d __, 2019 WL 4865832 (Fed. Cir. Oct. 3, 2019) ...................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................24

*Automated Tracking Solutions, LLC v. The Coca-Cola Co.*,
   223 F. Supp. 3d 1278 (N.D. Ga. 2016) (Duffey, J.) ............................................8

*Bancorp. Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
   687 F.3d 1266 (Fed. Cir. 2012) ........................................................................10

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ..........................................................................8

*Bilski v. Kappos*,
   561 U.S. 593 (2010)............................................................................................7

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019) ........................................................................18

*CG Tech. Dev., LLC v. William Hill U.S. Holdco, Inc.*,
   2019 WL 4055000 (D. Del. Aug. 28, 2019).....................................................10

i

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019) ...................................... 2, 10, 11, 12, 14, 15, 19

*Chargepoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) .............................................................12

*Citrix Sys., Inc. v. Avi Networks, Inc.*,
  363 F. Supp. 3d 511 (D. Del. 2019).....................................................9

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017) ...........................................................8

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) .........................................................10

*Diamond v. Diehr*,
  450 U.S. 175 (1981)............................................................................13

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*,
  355 F. Supp. 3d 785 (D. Minn. 2019)................................................25

*Encoditech LLC v. Qardio, Inc.*,
  2019 WL 2526725 (D. Del. June 19, 2019) .......................................12

*Epic IP LLC v. Backblaze, Inc.*,
  351 F. Supp. 3d 733 (D. Del. 2018) (Bryson, J., sitting by designation)..........................................................................8, 9, 13, 14

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) .........................................................10

*Le Roy v. Tatham*,
  55 U.S. 156 (1852).................................................................................7

*Mas-Hamilton Grp. v. LaGard, Inc.*,
  156 F.3d 1206 (Fed. Cir. 1998) .........................................................21

*Mayo Collaborative Servs. Prometheus Labs., Inc.*,
  566 U.S. 66 (2012)...................................................................8, 14, 19

*Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*,
    173 F. Supp. 3d 1324 (N.D. Ga. 2016) (Totenberg, J.) .................................8, 10

*O'Reilly v. Morse*,
    56 U.S. 62 (1853) ..................................................................................................7

*Orcinus Holdings, LLC v. Synchronoss Techs., Inc.*,
    379 F. Supp. 3d 857 (N.D. Cal. 2019) ...............................................................12

*Ottah v. BMW*,
    230 F. Supp. 3d 192 (S.D.N.Y. 2017), *aff'd sub nom. Ottah v. Fiat
    Chrysler*, 884 F.3d 1135 (Fed. Cir. 2018) .........................................................24

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017) ........................................................................15

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ..........................................................................8

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017) ..........................................................................18

*Starhome GmbH v. AT&T Mobility LLC*,
    743 F.3d 849 (Fed. Cir. 2014) ..........................................................................21

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) .........................................................1, 11, 13, 15

*Uniloc USA Inc. v. LG Elecs. USA Inc.*,
    379 F. Supp. 3d 974 (N.D. Cal. 2019)...............................................................13

*Valentine Commc'ns, LLC v. Six Continents Hotels, Inc.*,
    389 F. Supp. 3d 1223 (N.D. Ga. 2019) (Ray, J.) ..............................................8, 9

## Statutes

35 U.S.C. § 101 .......................................................1, 7, 8, 9, 10, 13, 19

35 U.S.C. §§ 112–113 ........................................................................................4

35 U.S.C. § 121 .................................................................................................23

## I.     Introduction

Defendant Square, Inc. offers a Point of Sale ("POS") system—an innovative technology that first allowed merchants of any size to accept card payments anytime, anywhere. Plaintiff SendSig, LLC alleges that Square's POS system infringes a patent about instantly sending handwritten chat messages between users. In particular, SendSig alleges that Square's technology, which allows users to obtain an emailed receipt after a purchase transaction, somehow makes Square's system a "real-time electronic messaging system," and Square therefore infringes U.S. Patent No. 6,564,249 ("the '249 patent"). But SendSig fails to state a claim for infringement for two, independent reasons.

First, the '249 patent is an invalid attempt to claim ownership of an abstract idea, implemented in a well-known and conventional way, as opposed to a genuine invention. It therefore is not eligible for patent protection under 35 U.S.C. § 101. SendSig's patent is directed to the abstract idea of sending and receiving handwritten information over a network. The Federal Circuit, and numerous district courts, have held that sending and receiving information (of any kind) over a network is an abstract idea. *See, e.g.*, *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). To that idea, SendSig adds only existing, off-the-shelf technology for capturing the handwriting electronically and sending it, in real-time, over a network. But "well-understood, routine, [and] conventional activities

previously known to the industry" cannot save patent claims that otherwise are directed to abstract ideas. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 225 (2014); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019) ("using off-the-shelf technology for its intended purpose" cannot "save the claims from abstractness" and thus ineligibility). Here, the patent itself concedes that the added features were well-understood, routine, and conventional. (*See, e.g.*, '249 patent at 2:58–60; 4:25–32.) In such cases, the Federal Circuit, judges in this Court, and district courts from around the country have granted dismissal on the pleadings and with prejudice. The Court should do the same here.

Second, SendSig's Complaint does not, and cannot, state a claim for infringement. The '249 patent covers "real-time messaging systems," more commonly known as instant messaging. But SendSig alleges—quite correctly—that Square sends its receipt using standard, internet email. *See* D.I. 1 ¶¶ 40, 46, 51–55. Standard email is not real-time or instant messaging. In fact, the '249 patent explicitly and repeatedly contrasts the required "real-time messaging system" with the "standard Internet email" systems at issue here. ('249 patent at 5:14–18; 8:22–10:54; *see also id.* at 10:36–41 (contrasting a graphics "file appended to standard email" with graphical information sent "to a real-time messaging server which provides real-time messaging service between client devices").) SendSig's own allegations therefore establish that Square's system is not a real-time messaging system and therefore Square

does not infringe. That is a second, independent basis for dismissing SendSig's complaint with prejudice.

## II.     Statement of Facts

### A.     The Parties

Square is a technology company that offers innovative products and services for businesses of all sizes. Square was the first company to successfully develop a mobile POS system, allowing anyone to accept payment cards with only: (1) a smartphone or tablet, (2) Square's POS app, and (3) a portable card reader that easily connects to the device. In doing so, Square revolutionized the mobile payment industry by equipping any merchant—whether a farmers' market vendor, a taxicab driver, a local coffee shop, or a neighborhood store—with the power to accept credit card payments anytime and anywhere. Today, Square offers a range of devices, solutions, and services that empower businesses of all sizes to do everything they need to run their business, from running payroll, to obtaining capital, to managing inventory, to accepting payments and sending digital receipts.

SendSig, LLC is a non-practicing entity, meaning it does not appear to have any business operations aside from owning, asserting, and licensing patents. According to the Complaint, one of those patents is the '249 patent, titled "Method and System for Creating and Sending Handwritten or Handdrawn Messages." SendSig

acquired the '249 patent from Intellectual Ventures on April 24, 2018, who had acquired it from other non-practicing entities.[1] SendSig alleges that Square's POS system and digital receipts technology infringes at least claim 1 of the '249 patent.

### B.     The '249 Patent

Broadly speaking, a patent has two parts: (1) a written description (often called the patent's "specification"); and (2) claims that delineate the scope of the alleged invention protected by that patent (i.e., the "claimed invention"). The written description consists of (among other things) a title, abstract, discussion of drawings, background sections, and a detailed description of one or more allegedly inventive technologies. 35 U.S.C. §§ 112–113. The background section of a patent typically identifies known prior art (*i.e.*, existing technology or information, considered to be "applicant admitted prior art"), but as is the case here, patents sometimes also identify known prior art in other sections.

The '249 patent "teaches an electronic messaging system that allows a sender to input a handwritten or handdrawn message." (D.I. 1 ¶ 27.) The patent purports to solve a perceived problem in the prior art. The patent explains that it was well-known that handwriting could be displayed on a computer and captured electronically, but "none of the [then] current electronic messaging methods allow[ed] a user to . . . send, receive, and view a handwritten or handdrawn" message. (*Id.* ¶ 26 (quoting

---

[1] *See* U.S. Patent and Trademark Office Assignment Abstract, *available at* https://assignment.uspto.gov/patent/index.html#/patent/search/result-Abstract?id=6564249&type=patNum.

'249 patent at 2:15–18).) The patent thus alleged "there [was] a clear need for an electronic messaging system that allow[ed] people to communicate with their own handwriting or drawing, as contrasted to typed text." (*Id*. ¶ 25 (quoting '249 patent at 2:11–15).) That statement is puzzling, however, because the patent plainly: (1) acknowledges that existing electronic messaging systems allowed creating, sending, receiving, and viewing handwritten messages, *i.e.* graphical data ('249 patent at 1:33–35, 12:28–29) and (2) also recounts that existing electronic devices could readily capture handwriting as graphical information. (*Id*. at 2:58–60, 4:25–32.) At most, the purported invention is the combination of these two existing technologies.

The patent's specification delineates five different "versions" of the purported invention: (1) the "Handwriting Java Client and Handwriting Java Server Version" (*id*. at 5:19–7:22); (2) the "Handwriting Java Client and Domino Server Version" (*id*. at 7:23–8:21); (3) the "Handwriting Java Client and *Real Time Server* Version" (*id*. at 8:22–9:10) (emphasis added); (4) the "Handwriting Java Client and Internet Email Server Version" (*id*. at 9:11–32); and (5) the "Handwriting Client and Wireless *Real Time Server* Version" (*id*. at 10:55–12:42) (emphasis added).[2]

As is obvious from the titles of these "Versions," the patent distinguishes between the "real time" (*i.e.*, Versions (3) and (5) above) and non-real time "Versions."

---

[2] The patent mistakenly says that there are "four versions" of the alleged invention. '249 patent at 5:14–18. That text is a holdover from a prior patent application which listed only four versions. The fifth version was added when the '249 patent application was filed.

The "Real Time" versions use a "real-time messaging server which provides real-time messaging service[s] between client devices." (*Id*. at 10:39–41.)  The patent describes the "Real Time" versions as having client devices connected to, and logged onto, the "Real Time Server" so that the online users are visible to each other, can initiate conversations with each other, and can communicate "instantly." (*See id*. 11:5–15.) The patent further explains that the remote client devices must be directly connected to the server so that software on each client computer can "poll" the server for messages and receive them in real-time. (*Id*. at 9:1–3; 12:2–5.) In contrast, other versions use "standard Internet email client[s], such as Microsoft Outlook, Pegasus Mail, Eudora mail, or Lotus Notes." (*Id*. at 6:10–13.)

SendSig's complaint explicitly identifies just one claim—claim 1—that Square allegedly infringes, but all of the claims are substantially similar in scope. All claims explicitly require a "real-time electronic messaging system" and a "real-time messaging server" and therefore are directed to the "Real Time Server Version[s]" described in the specification. Claim 1 is exemplary, and it reads (with emphasis added):

1. A **real-time electronic messaging** system comprising:

    (a) **a server component operable on a server computer on a network with a real-time messaging server** for receiving an electronic message sent from a sender and sending it to a recipient to whom it is addressed,

    (b) a remote client device for the sender connectable to the server computer through an online data connection to the network, and a client component

6

operable on the remote client device for setting up a graphical data cap-
ture area in a visual interface of the remote client device, said client com-
ponent including a graphical input device that is operatively coupled to
the graphical data capture area for allowing the user to enter handwritten
or handdrawn input through the graphical input device, and for capturing
the handwritten or handdrawn input as graphical data and **sending it as
an electronic message to the server component via the network** for
sending to the recipient addressed, and

(c) at least another remote client device for the **recipient connectable to the
server computer through an online data connection to the network**,
having a utility for receiving the electronic message sent to the recipient
by the server component and viewing it as a handwritten or handdrawn
message.

### III.   The '249 Patent's Claims Are Not Eligible for Patent Protection Under the Supreme Court's Two-Step *Alice* Test.

Section 101 of the Patent Act defines the scope of subject matter eligible for
patent protection: "Whoever invents or discovers any new and useful process, ma-
chine, manufacture, or composition of matter, or any new and useful improvement
thereof, may obtain a patent therefor . . . ." 35 U.S.C. § 101. But the Supreme Court
long has held—"for more than 150 years"—that "[l]aws of nature, natural phenom-
ena, and abstract ideas" are excluded from Section 101 and thus not patent eligible.
*Alice*, 573 U.S. at 216 (citing *Bilski v. Kappos*, 561 U.S. 593, 594, 601–02 (2010));
*see also O'Reilly v. Morse*, 56 U.S. 62, 112–20 (1853); *Le Roy v. Tatham*, 55 U.S.
156, 174–75 (1852).

To determine whether patent claims are ineligible for patent protection, courts
use a two-step approach mandated by the Supreme Court in the *Alice* case. 573 U.S.
at 217–18. At step one, a court asks whether the claims are directed to a patent-

ineligible, abstract idea. *Id*. If so, the court turns to step two, and asks whether the claims add an "inventive concept"—that is, an additional element or elements that are "significantly more" than the idea itself and "transform" the claim. *Id.* at 217–18, 221–22 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 73–74 (2012)). Additional elements that involve "well-understood, routine, [and] conventional activit[ies] previously known to the industry" cannot qualify as 'inventive concepts.' *Id*. at 225 (quoting *Mayo*, 566 U.S. at 79) (quotation marks omitted). Under this test, if a claim is directed to an abstract idea under step one and lacks an inventive concept at step two, it is ineligible under § 101 and invalid.

Whether a patent is ineligible under § 101 "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *see also Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced."); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).[3] Although "plausible factual allegations [that the

---

[3] Cases from this Court are in accord. *See Valentine Commc'ns, LLC v. Six Continents Hotels, Inc.*, 389 F. Supp. 3d 1223, 1233 (N.D. Ga. 2019) (Ray, J.) (granting Rule 12(b)(6) motion to dismiss for failure to claim patent-eligible subject matter under § 101); *Automated Tracking Solutions, LLC v. The Coca-Cola Co.*, 223 F. Supp. 3d 1278, 1292 (N.D. Ga. 2016) (Duffey, J.) (same for Rule 12(c) motion for judgment on the pleadings); *Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*, 173 F. Supp. 3d 1324, 1336 (N.D. Ga. 2016) (Totenberg, J.) (same); *see generally Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d 733, 751 (D. Del. 2018)

challenged claims have more than well-understood, routine, and conventional elements] may preclude dismissing a case . . . where . . . nothing on th[e] record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)," *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018), there are no such allegations here. And, as discussed more below, the patent's own specification confirms that every claim in the '249 patent is ineligible under § 101. Under such circumstances, courts dismiss with prejudice on the pleadings. *See, e.g.*, *Valentine*, 389 F. Supp. 3d at 1232–33 (granting Rule 12(b)(6) motion where the "patent specifications admit that the computer components used to carry out the claimed invention are well-known, conventional, and routine components" and any "legitimate factual dispute" was "foreclosed"); *Citrix Sys., Inc. v. Avi Networks, Inc.*, 363 F. Supp. 3d 511, 520 (D. Del. 2019) ("'[I]n a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute.'") (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1356 (Fed Cir. 2018)).

Here, the claims of the '249 patent are directed to the abstract idea of sending and receiving handwritten messages over a network and lack an inventive concept to save them from ineligibility.

---

(Bryson, J., sitting by designation) (collecting recent district court cases "affirm[ing] § 101 rejections at the motion to dismiss stage").

**A.    Step One: The '249 Patent is Directed to the Abstract Idea of Sending and Receiving Handwritten Messages over a Network.**

At step one of the analysis, courts determine if the patent is directed to an abstract idea, rather than a concrete invention, by "look[ing] at the focus of the claimed advance over the prior art"—i.e. what purportedly makes the claims inventive over existing technology and devices. *Chamberlain*, 935 F.3d at 1346; *see also Mobile Telecomms. Techs.*, 173 F. Supp. 3d at 1330 (explaining that, at step one, the "trick is to try and detect the beating heart of the patent, its animating function" (citing *Bancorp. Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir. 2012)).

Here, the focus of the claims, and their "claimed advance" over the prior art, is obvious from the get-go: They are directed to the idea of sending and receiving handwritten messages over a network. All of the claims focus on that idea, broken into the self-evident steps of: (1) capturing handwritten information; (2) transmitting that information, via a network, to a recipient; and then (3) receiving the information and viewing it. *See, e.g.*, '249 patent at claim 1.[4] The specification confirms that

---

[4] As mentioned, Claim 1 is representative of all claims in the '249 patent because they are "substantially similar and linked to the same abstract idea." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 n.9 (Fed. Cir. 2016). Claims 1 and 11 are essentially identical to one another, and the other claims add only insignificant, conventional elements, such as mobile phones or pagers. Moreover, for the § 101 analysis, the Court need not "individually address claims not asserted or identified by the non-moving party." *CG Tech. Dev., LLC v. William Hill U.S. Holdco, Inc.*, 2019 WL 4055000, at *2 (D. Del. Aug. 28, 2019) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348

focus. It explains—as discussed above—that prior art electronic devices for capturing handwriting "have not been enabled for electronic messaging." *Id.* at 1:52–56. Thus, the claims of the '249 patent are directed to "an electronic messaging system that allows people to communicate with their own handwriting or drawing, as contrasted to typed text," for which the patent states there was a "clear need." *Id.* at 2:12–14; *see also id.* at 1:18–19.

That idea—sending and receiving handwritten information over a network— is abstract. To determine whether the focus of the claims is abstract, courts use common law reasoning:  They compare the claims at issue with claims previously found to be directed to an abstract idea. *Chamberlain*, 935 F.3d at 1346–47. The Federal Circuit repeatedly has held that claims similarly directed to the idea of sending and receiving information over a network, including graphical information, are abstract. *See, e.g.*, *Two-Way Media*, 874 F.3d at 1337 (holding that claims regarding real-time streaming of media content were directed to the "abstract idea of (1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information"); *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (holding that claims to "wirelessly communicat[e] regional broadcast content to an

---

(Fed. Cir. 2014)). Claim 1 also is the only claim that SendSig has alleged Square infringes. (D.I. 1 ¶ 73.)

out-of-region recipient" were directed to the abstract idea of "providing out-of-region access to regional broadcast content"); *see also Chamberlain*, 935 F.3d at 1347 (holding that claims directed to wireless sending and receiving of status information about a garage door were abstract); *Chargepoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 770 (Fed. Cir. 2019) (concluding that claims directed to transmitting status information about network-controlled electric vehicle charging stations were directed to "the abstract idea of communication over a network to interact with network-attached devices").[5]

There is a second reason these claims are directed to an abstract idea. The Federal Circuit has explained that claims are directed to an abstract idea when they say *what* is accomplished without identifying *a concrete way* of accomplishing it. In patent jargon, those claims are said to be functional—*i.e.* they describe the *result* of each step (the function performed), rather than the actual *means* for achieving that

---

[5] District courts around the country agree. *See Encoditech LLC v. Qardio, Inc.*, 2019 WL 2526725, at *4 (D. Del. June 19, 2019) (holding that claims regarding sending encryption keys for secure wireless communication between mobile devices were directed to "the abstract idea of establishing a secure wireless communication link and sending and receiving encrypted messages"); *Orcinus Holdings, LLC v. Synchronoss Techs., Inc.*, 379 F. Supp. 3d 857, 873–74 (N.D. Cal. 2019) (holding that claims regarding storing data on a computer, sending the data "across a mobile network to a server," and retrieving the data were directed to "the abstract idea of transmitting and retrieving data"); *Uniloc USA Inc. v. LG Elecs. USA Inc.*, 379 F. Supp. 3d 974, 990 (N.D. Cal. 2019) (patent claiming an alleged improvement to wireless Bluetooth technology through adding an additional inquiry field to improve response time was directed to "the abstract idea of additional polling in a wireless communication system").

result. *Am. Axle and Mfg., Inc. v. Neapco Holdings LLC*, __ F.3d __, 2019 WL 4865832, at *7 (Fed. Cir. Oct. 3, 2019) ("Th[e] distinction between results and means is fundamental to the step 1 eligibility analysis.") (citing *Diamond v. Diehr*, 450 U.S. 175, 191 (1981)); *see also id*. at *7 n.5 (collecting recent Federal Circuit cases affirming that a claim that fails to specify the means of how to implement the idea is directed to an abstract idea and ineligible under § 101); *Epic IP*, 351 F. Supp. 3d at 737–40 (collecting cases that looked to functional language as an indicia of abstraction at *Alice* step one because such claims "recite the concept, but not the way to implement it").

Every element of claim 1 of the '249 patent consists entirely of functional language. The claim elements list a "component" or "device" "for" achieving a certain function without reciting a specific way to accomplish the function. For example, Claim 1 recites a "server component" "for receiving an electronic message sent from a sender and sending it to a recipient to whom it is addressed." '249 patent at claim 1.[6] These elements, like those in *Two-Way Media*, "require[] . . . functional results . . . but do[] not sufficiently describe *how* to achieve these results in a non-abstract way." 874 F.3d at 1337 (emphasis added).

---

[6] Or a "client component" "for setting up a graphical data capture area in a visual interface of the remote client device." *Id*. Or a "graphical input device" "for allowing the user to enter handwritten or handdrawn input through the graphical input device, and for capturing the handwritten or handdrawn input as graphical data and sending it as an electronic message." *Id*.

In sum, the '249 patent's claims are directed to an abstract idea for two independent reasons. First, they are directed to sending and receiving handwritten information over a network, which is well-established by the Federal Circuit as an abstract idea. Second, they use functional language to describe the alleged invention, which demonstrates they are directed to abstract results rather than a concrete way of achieving them.

### B.    Step Two: The Claims Lack Any "Inventive Concept" That Is Significantly More than the Abstract Idea Itself.

Step two of the *Alice* analysis requires searching the claims for an "inventive concept"—*i.e.* "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18 (emphasis added). "Simply appending conventional steps, specified at a high level of generality, [i]s not enough to supply an inventive concept." *Chamberlain*, 935 F.3d at 1348 (quoting *Alice*, 573 U.S. at 222) (alteration in original). Instead, at step two, courts "look more precisely at what the claim elements add," *Epic IP*, 351 F. Supp. 3d at 736, and ask "two distinct questions:

> (1) whether each of the elements in the claimed product (apart from the [abstract ideas] themselves) involve[s] well-understood, routine, conventional activity previously engaged in by researchers in the field, and
>
> (2) "whether all of the steps as an ordered combination" add something "that is not already present when the steps are considered separately."

14

*Chamberlain*, 935 F.3d at 1349 (quoting *Mayo*, 566 U.S. at 73, 79) (internal quotation marks and citations omitted). The "inventive concept must be evident in the claims," meaning any features described elsewhere in the patent but not captured in the claims are irrelevant to the step two analysis. *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017); *see also Two-Way Media*, 874 F.3d at 1338–39 (finding the claim ineligible because "the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept.").

Here, there is no inventive concept in the claims.

### i. The individual elements do not add an "inventive concept" because each involves well-understood, routine, and conventional activity.

When searching for an inventive concept, courts disregard the abstract idea itself—here, the steps of sending and receiving handwritten messages over a network—because the abstract idea cannot be the "inventive concept." *See Chamberlain*, 935 F.3d at 1349 ("Wireless communication cannot be an inventive concept here, because it is the abstract idea that the claims are directed to."). Claim 1 of the '249 patent adds only generic computer, technology, hardware, and functions to its abstract idea. At most, the claim adds: (1) using a server with remote client devices for real-time messaging; and (2) using a "graphical data capture area" on the client computer to electronically capture handwriting with a "graphical input device." ('249 patent at 15:59–17:6.) But the patent itself says that both of those additions

comprise well-understood, routine, and conventional activities. They therefore do not qualify as "inventive concepts."

      **It was well-understood, routine, and conventional to use a server with remote client devices for real-time messaging.** The patent does not claim to have invented a new kind of "server computer" or "remote client device." To the contrary, the specification explains that the claimed "server computer" is conventional. ('249 patent at 3:62–65 ("The term 'server computer' is used to refer to *any* type of data processing device that is connected to a node on a network for providing services to client devices on the network.") (emphasis added). And the "remote client device" is likewise *any* computing device. (*Id.* at Abstract ("[T]he remote client device can be a wireless PDA, always-on pager or messaging device, or mobile phone with SMS or EMS service."); *see also id.* at 3:48–51 ("The term 'client computer' refers to any computer capable of connecting to a server computer on a network and per-forming a function with the server computer.").) The patent also concedes—as it must in light of instant-messaging apps like AOL Instant Messenger and Yahoo! Messenger that were well-known at the time of the '249 patent—that real-time mes-saging using servers and client devices was well-known. (*Id.* at 10:56–65 (describing an existing "real-time server" that can be accessed "through an Internet Wireless Service Provider" with "PDAs and mobile communication devices"); *see also id.* at

11:36–38 (identifying that "real-time communication systems" such as "instant mes-saging systems" were known in the art); *infra* pp. 4–5 (describing known real-time systems).)

**It was well-understood, routine, and conventional to use a "graphical data capture area" on the client computer to electronically capture handwriting with a "graphical input device."** The patent similarly does not claim to have in-vented "graphical input devices" or the use of a "graphical data capture area" on a computer to electronically capture handwriting. Instead, the specification names spe-cific, *known* "graphical input devices" that were commonly in use with programs like Microsoft Paint to enter and electronically capture handwritten or hand-drawn content: "The graphical input device can be a touch screen, pen input device, stylus pad, or even a standard mouse." ('249 patent at 2:58–60; *see also id.* at 4:25–32 ("Examples of such input devices include the Wacom Graphire™ pen tablet . . . [or a] pen device . . . integrated with a touch screen, e.g., as also offered by Wacom . . . .").) These existing devices conventionally used a "handwriting (e.g. stylus) data capture area" so users could see what they were drawing. (*Id.* at 11:2–3.)

Accordingly, the pleadings and the patent itself establish that the individual elements of the claims comprise only well-understood, routine, and conventional activity. SendSig has made no factual allegations to the contrary. Under governing law, the individual elements therefore do not add an "inventive concept." And as shown below, neither does the ordered combination of those elements.

17

>           ii.    **The ordered combination fails to add anything signifi-
>                  cant.**

As part of the *Alice* Step Two analysis, the Court must also examine the or-

dered combination of elements to determine if it adds an "inventive concept" to the

abstract idea. Here, the ordered combination adds nothing to the idea of sending and

receiving handwritten messages over a network. Indeed, the order simply is the ab-

stract idea itself—*i.e.*, composing, sending over a network, and then receiving a

handwritten electronic message. A first device captures and saves the handwriting

and sends it to a server, the server routes the message to the intended recipient, and

then a second device receives and views the message. It is axiomatic that the "in-

ventive concept" cannot be the idea itself. *See infra* p. 15.

SendSig does allege, in its complaint, that "[t]he particular combination of

claims elements recited in claim 1 of the '249 Patent was not well-understood, rou-

tine, or conventional to a skilled artisan in the relevant field at the time of the inven-

tions." (D.I. 1 ¶ 74.) But this allegation is not entitled to any weight because the

claims and patent specification contradict it and because it is wholly conclusory. *See,*

*e.g.*, *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir.

2017) ("In ruling on a 12(b)(6) motion, a court need not accept as true allegations

that contradict matters properly subject to judicial notice or by exhibit, such as the

claims and the patent specification."); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d

1306, 1317 (Fed. Cir. 2019) (explaining that "we do not read *Aatrix* to say that any

allegation about inventiveness, wholly divorced from the claims or the specification,

18

defeats a motion to dismiss" and clarifying that only "*plausible and specific* factual allegations" can create a issue of fact) (emphasis added).

Even if credited, this allegation fails for the same reasons articulated in *Chamberlain*, 935 F.3d at 1349. There, the patent owner argued that even if the individual elements were well-understood, routine, and conventional, the ordered combination was not. *Id.* at 1348–49. The Federal Circuit explained that combining well-understood, routine, and conventional components could not create an "inventive concept." *Id.* Instead, to qualify as an "inventive concept," the ordered combination must add something to the abstract idea "not already present when the steps are considered separately." *Id.* at 1349 (quoting *Mayo*, 566 U.S. at 79). Here, SendSig's Complaint does not, and cannot, allege that the order of capturing, sending, and receiving handwritten messages adds something not already present in the individual elements, which the patent concedes were all well-known. *See infra* pp. 15–17. In *Chamberlain*, the patent involved sending a particular type of information using known technology—a wireless network. 935 F.3d at 1349. Here, the patent involves sending a particular type of information using a known technology—instant messaging. Thus here, as in *Chamberlain*, there is nothing inventive in the individual elements or in the elements' ordered combination.

In sum, the claim for infringement of the '249 patent thus should be dismissed on the pleadings as the patent is ineligible under § 101 because it is directed to the abstract idea of sending and receiving handwritten messages over a network and fails

to add an "inventive concept." The individual elements were well-understood, routine, and conventional in the field, and the ordered combination adds nothing more. This conclusion is readily supported by the patent's claims and the specification, and there are no factual issues preventing resolution as a matter of law.

## IV.    Square's Point of Sale System Does Not Infringe the '249 Patent.

Sendsig's Complaint also fails because it does not state a claim for infringement. SendSig accuses Square's POS system of infringement because customers can request a receipt via their "personal email services," such as Gmail or Hotmail (D.I. 1 ¶ 55.) But SendSig's patent claims do not cover POS systems that send receipts via personal email. The claim requires a "real-time electronic messaging system" with a "real-time messaging server." ('249 patent at 15:59–61.) Real-time messaging services—such as the AOL Instant Messenger and Yahoo! Messenger services of this era—were services in which a user logged on to a real-time server and found other users also logged on to "initiate a private, real-time communication session." (*Id.* at 11:23–26; *see also id.* at 11:16–18 (explaining that the "real-time server version allows people to communicate privately and personally by instantly sending handwriting").) Square's POS system is fundamentally different from a real-time electronic messaging system and, as a matter of law, does not infringe.

To state a claim for patent infringement, a plaintiff must plead facts showing that every element (often called a "limitation" in patent jargon) is found in the product accused of infringing. *See, e.g., Starhome GmbH v. AT&T Mobility LLC*, 743

F.3d 849, 858 (Fed. Cir. 2014) ("To prove infringement, a patentee must show that the accused device meets each claim limitation."). If any claim limitation is absent from the accused device, there is no infringement as a matter of law. *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

Square's POS system does not infringe because SendSig alleges that Square uses a regular email server, which is distinct from a "real time messaging server." The "real-time server" is discussed in two, specific portions of the specification. ('249 patent at 8:22–9:10; *id.* at 10:55–12:36.) Those are the only portions of the written description that are specifically called out as the "real-time server version" and incorporate real-time messaging. Moreover, Figure 4B below is the only depiction of the Real-Time Server Version:



FIG. 4ᴮ
Handwriting Client and Real Time Server Version

Figure 4B shows that both client devices (410a) are directly connected to the real-time server (420a). The patent further explains that in the "Real-Time Server Version," both "Client Computer[s]"—*e.g.*, a mobile phone that sends a message out and a mobile phone that receives the message sent by the first phone—must be connected to the server so that software on each client computer can "poll" the server for messages and receive them in real-time. (*Id.* at 9:1–3 (explaining that real-time communications require software on each client to "poll" the real-time server for messages); 12:2–5 (same).) And this makes sense. A direct connection is also necessary for a real-time messaging system to work. The client devices must be connected and logged on to the real-time server so that the online users are visible to each other, can initiate conversations with each other, and can communicate "instantly." (*See id.* at 11:5–15.)

In contrast, SendSig alleges that Square allows purchasers to request a receipt via standard email, *i.e.* using "their personal email services." (D.I. 1 ¶ 55).  According to the allegations in the complaint, the Square POS system sends "electronic messages from the Square server" to the server associated with a "personal email service[]." (*Id.* ¶¶ 54–55.) For instance, for a user with a Gmail account, the Square POS system sends the receipt to an outgoing email server, which sends it to a Gmail server, and it is that server that is connected to, and sends the message to, a remote client device. (*See id.* ¶ 55). This is like sending a message from, for example, a

Hotmail account to a Yahoo! account. The transmission involves at least two different servers (the outgoing Hotmail server connecting to the receiving Yahoo! Server) with no single server connecting the clients, making "real-time messaging" impossible.

Real-time messaging systems with real-time messaging servers cannot be conflated with regular email systems, as SendSig's complaint seeks to do. The patent itself starkly contrasts the use of "a standard Internet email mail server" ('249 patent at 9:13–14), with the use of a real-time server. In particular, it explains that sending handwriting via an "Internet Email Server" (*id.* at 9:11, 9:34–35) is an entirely different "Version" of the alleged invention than the "Real-Time Server Version" (*id.* at 8:22). The written description of the '249 patent identifies five different "Versions:" (1) "a Handwriting Java Sever Version" (2) "a Domino Server Version" (3) "a Real-Time Java Server Version," (4) "an Internet Email Server Version," and (5) a "Handwriting Client and Wireless Real Time Server Version." ('249 patent at 5:14–18.) Only one of these versions—the "Real-Time Version"—is at issue in the '249 patent. That is not unusual. A patent's written description often describes several different alleged inventions, but each patent application must be limited to a single "independent and distinct invention[]" as defined by the patent claims. 35 U.S.C. § 121. Thus, applicants subsequently file other applications—based on the same written description—that claim the other, distinct technology not addressed in

the first application. That is exactly what happened here. The patentee's first application claimed Version (4): the "Internet Email Server Version." (*See* U.S. Patent No. 6,304,898.)[7] Immediately after the '898 patent was approved, the application for the '249 patent was filed. In contrast to the '898 patent, which covered the "standard Internet email mail server" ('249 patent at 9:13–14), the claims in the new application addressed Version (3): the "Real-Time" Server version. Indeed, each claim of the '249 patent explicitly requires Version (3)'s "real-time electronic messaging" system and "a real-time messaging server" for receiving and sending messages. ('249 patent at 15:59–63.)

SendSig has not pled, and cannot plausibly plead, that Square's POS system, which sends an email receipt, is a "real-time electronic messaging system" that uses a "real-time messaging server," like AOL Instant Messenger, for example, where the sender and recipient are directly connected to an AOL instant messaging server. ('249 patent at 15:59–61; *id.* at 17:43, 18:8.) The Court's role, as gatekeeper to the Courthouse, is to use its "judicial experience and common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), to dismiss claims, like those here, that lack a plausible basis for alleging infringement. That is what numerous other judges have done when a complaint shows that there is no infringement—they have dismissed the case, on the pleadings, with prejudice. *See, e.g.*, *Ottah v. BMW*, 230 F. Supp. 3d 192, 197 (S.D.N.Y. 2017), *aff'd sub nom. Ottah v. Fiat Chrysler*, 884 F.3d 1135 (Fed. Cir.

---

[7] SendSig does not allege that Square infringes the '898 patent.

2018) (dismissing claims on Rule 12(b)(6) motion with prejudice where the pleadings show there is no infringement); *see also ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 793–95 (D. Minn. 2019) (denying motion to amend after complaint was dismissed because Plaintiff cannot contradict the admissions it made in its original complaint).

## V.    Conclusion

Because the '249 patent is directed to an abstract idea and fails to add any significant element or combination of elements to transform the claim, and because the Complaint fails to plausibly allege that Square infringes the '249 patent, the Court should dismiss the Complaint with prejudice.

October 15, 2019                           Respectfully submitted,

                                           s/ Todd E. Jones

*Of counsel*:                              Todd E. Jones
Theodore J. Angelis, *p.h.v. pending*      Georgia Bar No. 403925
*theo.angelis@klgates.com*                 *tjones@taylorenglish.com*
Elizabeth J. Weiskopf, *p.h.v. pending*    TAYLOR ENGLISH DUMA LLP
*elizabeth.weiskopf@klgates.com*           1600 Parkwood Circle
Nicholas F. Lenning, *p.h.v. pending*      Suite 200
*nicholas.lenning@klgates.com*             Atlanta, GA 30339
K&L GATES LLP                              (770) 434-6868
925 Fourth Avenue, Suite 2900             (770) 434-7376 (fax)
Seattle, WA 98104
(206) 623-7580                             Counsel for Defendant
(206) 370-6006 (fax)                       SQUARE, INC.

## <u>LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief has been prepared in 14 point Times New Roman font in accordance with Local Rule 5.1(C).

*<u>/s/ Todd E. Jones</u>*
Todd. E. Jones
Georgia Bar No. 403925
