IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SendSig, LLC, | |
| Plaintiff, | The Honorable J. P. Boulee |
| - vs. - | No. 1:19-cv-03733-JPB |
| Square, Inc., | |
| Defendant. | |

## BRIEF IN SUPPORT OF DEFENDANT SQUARE, INC.'S MOTION TO DISMISS AMENDED COMPLAINT

Theodore J. Angelis, *p.h.v.*
*theo.angelis@klgates.com*
Elizabeth J. Weiskopf, *p.h.v.*
*elizabeth.weiskopf@klgates.com*
Nicholas F. Lenning, *p.h.v.*
*nicholas.lenning@klgates.com*
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580
(206) 370-6006 (fax)

Todd E. Jones (No. 403925)
*tjones@taylorenglish.com*
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
(770) 434-6868
(770) 434-7376 (fax)

Counsel for Defendant
Square, Inc.

December 11, 2019

# TABLE OF CONTENTS

**Page**

I.    Introduction.................................................................................1

II.   Statement of Facts.....................................................................3

    A.    The Parties.................................................................3

    B.    The '249 Patent .........................................................4

III.  The '249 Patent's Claims Are Not Eligible for Patent Protection Under the Supreme Court's Two-Step *Alice* Test. ........................................7

    A.    Step One: The '249 Patent Is Directed to the Abstract Idea of Sending and Receiving Handwritten Messages over a Network. .......................8

    B.    Step Two: The Claims Lack Any "Inventive Concept" That Is Significantly More Than the Abstract Idea Itself.................................13

        i.    The individual elements do not add an "inventive concept" because each involves well-understood, routine, and conventional activity. ................................................14

        ii.   The ordered combination fails to add an inventive concept. ....17

    C.    The '249 Patent's Ineligibility Under § 101 Can and Should Be Resolved on the Pleadings...................................................19

IV.  Square's Point of Sale System Does Not Infringe the '249 Patent. ..............22

V.   Conclusion ...............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ..........................................................................20

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016) ............................................................................9

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)..................................................................................*passim*

*Am. Axle and Mfg., Inc. v. Neapco Holdings LLC*,
  939 F.3d 1355 (Fed. Cir. 2019) ..........................................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................25

*Automated Tracking Solutions, LLC v. The Coca-Cola Co.*,
  223 F. Supp. 3d 1278 (N.D. Ga. 2016)................................................................19

*BASCOM Global Internet Servs, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ..........................................................................18

*Bilski v. Kappos*,
  561 U.S. 593 (2010)..............................................................................................7

*Cellspin Soft, Inc. v. FitBit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019) ..........................................................................21

*CG Tech. Dev., LLC v. William Hill U.S. Holdco, Inc.*,
  2019 WL 4055000 (D. Del. Aug. 28, 2019)..........................................................9

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019) ...................................................................*passim*

*Chargepoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) ............................................................................10

i

*In re Chrona*,
656 Fed. App'x 1016 (Fed. Cir. Aug. 10, 2016) ................................................16

*Citrix Sys., Inc. v. Avi Networks, Inc.*,
363 F. Supp. 3d 511 (D. Del. 2019)...................................................................21

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) .........................................................................19

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*,
355 F. Supp. 3d 785 (D. Minn. 2019)................................................................25

*Encoditech LLC v. Qardio, Inc.*,
2019 WL 2526725 (D. Del. June 19, 2019) ......................................................10

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .........................................................................12

*Epic IP LLC v. Backblaze, Inc.*,
351 F. Supp. 3d 733 (D. Del. 2018)..............................................................11, 13

*Fitbit, Inc. v. AliphCom*,
233 F. Supp. 3d 799 (N.D. Cal. 2017)...............................................................15

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) .........................................................................15

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ...........................................................................9

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) .........................................................................12

*Le Roy v. Tatham*,
55 U.S. 156 (1852)................................................................................................7

*Mas-Hamilton Grp. v. LaGard, Inc.*,
156 F.3d 1206 (Fed. Cir. 1998) .........................................................................22

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .........................................................................12

*Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*,
    173 F. Supp. 3d 1324 (N.D. Ga. 2016) ........................................................8, 20

*O'Reilly v. Morse*,
    56 U.S. 62 (1853) ....................................................................................................7

*Orcinus Holdings, LLC v. Synchronoss Techs., Inc.*,
    379 F. Supp. 3d 857 (N.D. Cal. 2019) ................................................................10

*Ottah v. BMW*,
    230 F. Supp. 3d 192 (S.D.N.Y. 2017), *aff'd sub nom. Ottah v. Fiat*
    *Chrysler*, 884 F.3d 1135 (Fed. Cir. 2018) .........................................................25

*RecogniCorp, LLC v. Nintendo Co. Ltd.*,
    855 F.3d 1322 (Fed. Cir. 2017) ..........................................................................14

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ..........................................................................19

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017) ............................................................................21

*Starhome GmbH v. AT&T Mobility LLC*,
    743 F.3d 849 (Fed. Cir. 2014) ............................................................................22

*TAGI Ventures, LLC v. Turner Sports Interactive, Inc.*,
    2017 WL 3469528 (N.D. Ga. Feb. 17, 2017) ....................................................19

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ...........................................................1, 9, 10, 11

*Uniloc USA Inc. v. LG Elecs. USA Inc.*,
    379 F. Supp. 3d 974 (N.D. Cal. 2019) .........................................................10, 11

*Valentine Commc'ns, LLC v. Six Continents Hotels, Inc.*,
    389 F. Supp. 3d 1223 (N.D. Ga. 2019) ........................................................19, 21

**Statutes**

35 U.S.C. § 101 ...............................................................................................*passim*

35 U.S.C. § 112 ................................................................................................4

35 U.S.C. § 113 ................................................................................................4

35 U.S.C. § 121 ..............................................................................................22

**Other Authorities**

Fed.R.Civ.P. 12(b)(6) ..........................................................................19, 21, 25

U.S. Patent and Trademark Office Assignment Abstract, *available at*
     https://assignment.uspto.gov/patent/index.html#/patent/search/resu
     ltAbstract?id=6564249&type=patNum ...........................................................4

## I.    Introduction

Defendant Square, Inc. offers a Point of Sale ("POS") system—an innovative technology that first enabled merchants of any size to accept card payments anytime, anywhere. Plaintiff SendSig, LLC accuses Square's POS system of infringing U.S. Patent No. 6,564,249 ("the '249 patent"), directed to instantly sending handwritten chat messages between users. In particular, SendSig alleges that Square's system, which allows users to obtain an emailed receipt after a purchase transaction, is somehow a "real-time electronic messaging system." But SendSig fails to state a claim for two, independent reasons.

First, the '249 patent attempts to claim ownership of an abstract idea, as opposed to a genuine invention. It therefore is not eligible for patent protection under 35 U.S.C. § 101. SendSig's patent is direct to the idea of sending and receiving handwritten information over a network. The Federal Circuit, and numerous district courts, have held that the idea of sending and receiving information (of any kind) over a network is abstract. *See, e.g.*, *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). To that idea, SendSig adds only existing, off-the-shelf technology for capturing handwriting electronically and sending it, in real-time, over a computer network. But "'well-understood, routine, [and] conventional activit[ies]' previously known to the industry" cannot save patent claims that otherwise are directed to abstract ideas. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 225 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus*

*Labs., Inc.*, 566 U.S. 66, 73 (2012)); *see also Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019) ("using off-the-shelf technology for its intended purpose" cannot "save the claims from abstractness" and thus ineligibility). Here, the patent itself concedes the added features were well-understood, routine, and conventional. (*See, e.g.*, '249 patent at 2:58–60; 4:25–32.) In such cases, the Federal Circuit, this Court, and district courts from around the country dismiss all claims with prejudice, on the pleadings. The Court should do the same here.

Second, SendSig's Amended Complaint does not, and cannot, state a claim for infringement. The '249 patent covers "real-time messaging systems," more commonly known as instant messaging. But SendSig alleges—quite correctly—that Square sends its receipt using standard, internet email. (*See* D.I. 17 ¶¶ 42, 48, 53–57.) Standard email is not real-time or instant messaging, most notably because there is no direct connection between each remote device and the messaging server. The '249 patent explains (at 9:1–3, 12:2–5, Fig.2B) that this direct connection is required so each device can "poll" the server and send and receive messages instantly. SendSig's own allegations therefore establish that Square's system is not a real-time messaging system and does not infringe. That is a second, independent basis for dismissing SendSig's Amended Complaint with prejudice.

SendSig's original Complaint suffered from these same two flaws. In response to Square's initial motion to dismiss, the Amended Complaint adds only conclusory and ineffective allegations.[1] The Court should therefore grant Square's motion.

## II.   Statement of Facts

### A.   The Parties

Square was the first company to successfully develop a mobile POS system, allowing anyone to accept payment cards with only: (1) a smartphone or tablet, (2) Square's POS app, and (3) an easily attached, portable card reader. In doing so, Square revolutionized the mobile payment industry by equipping any merchant—whether a farmers' market vendor, a taxicab driver, a local coffee shop, or a neighborhood store—with the power to accept credit card payments anytime and anywhere. Today, Square offers a range of devices, solutions, and services that empower companies of all sizes to do everything they need to run their business, from running payroll, to obtaining capital, to managing inventory, to accepting payments and sending digital receipts.

SendSig, LLC is a non-practicing entity, meaning it does not appear to have any business operations aside from owning, asserting, and licensing patents. According to the Amended Complaint, one of those patents is the '249 patent, titled "Method and System for Creating and Sending Handwritten or Handdrawn Messages." (D.I. 17 ¶ 19.) SendSig acquired the '249 patent from Intellectual Ventures

---

[1] In particular, SendSig's Amended Complaint modified paragraphs 27–28, and it added paragraphs 29–30 and 77–79.

on April 24, 2018, who had acquired it from other non-practicing entities.[2] SendSig alleges that Square's POS system and digital receipts technology infringe at least claim 1 of the '249 patent.

### B. The '249 Patent

Broadly speaking, a patent has two parts: (1) a written description (often called the patent's "specification"); and (2) claims that delineate the scope of the alleged invention protected by that patent (i.e., the "claimed invention"). The written description consists of (among other things) a title, abstract, discussion of drawings, background sections, and a detailed description of one or more allegedly inventive technologies. 35 U.S.C. §§ 112–113. The background section of a patent typically identifies known prior art (*i.e.*, existing technology or information, considered to be "applicant admitted prior art"), but as is the case here, patents sometimes also identify known prior art in other sections of the specification.

The '249 patent "teaches an electronic messaging system that allows a sender to input a handwritten or handdrawn message." (D.I. 1 ¶ 27.) But the specification of the '249 patent acknowledges that, at the time of the alleged invention, existing electronic messaging systems allowed sending, receiving, and viewing graphical data attachments to an electronic message, which could include handwriting ('249

---

[2] *See* U.S. Patent and Trademark Office Assignment Abstract, *available at* https://assignment.uspto.gov/patent/index.html#/patent/search/result-Abstract?id=6564249&type=patNum.

patent at 1:33–35, 12:28–29 (recounting that email, SMS, and EMS already permitted sending graphical information)). It also recounts that existing devices were capable of capturing handwriting as graphical information. The patent explains, however, that "none of [those then] current electronic messaging methods allow[ed] a user to . . . send, receive, and view a handwritten or handdrawn email message." (*Id.* ¶ 26 (quoting '249 patent at 2:15–18).)

The patent's specification delineates five different "versions" of the claimed invention: (1) the "Handwriting Java Client and Handwriting Java Server Version" ('249 patent at 5:19–7:22); (2) the "Handwriting Java Client and Domino Server Version" (*id.* at 7:23–8:21); (3) the "Handwriting Java Client and *Real Time Server* Version" (*id.* at 8:22–9:10) (emphasis added); (4) the "Handwriting Java Client and Internet Email Server Version" (*id.* at 9:11–32); and (5) the "Handwriting Client and Wireless *Real Time Server* Version" (*id.* at 10:55–12:42) (emphasis added).[3]

The third and fifth, the only "Real Time" versions disclosed by the patentee, use a "real-time messaging server which provides real-time messaging service[s] between client devices." (*Id.* at 10:39–41.) The patent describes the "Real Time" versions as having client devices directly connected to, and logged onto, the "Real Time Server" so that the online users are visible to each other, can initiate conversations, and can communicate "instantly"—as "real time" messaging systems require.

---

[3] The patent mistakenly says that there are "four versions" of the alleged invention. '249 patent at 5:14–18. That text is a holdover from a prior patent application. The fifth version was added when the '249 patent application was filed.

(*See id*. 11:5–15.) The patent further explains that this direct server-client connection enables software on each device to "poll" the server for messages and receive them in real-time. (*Id.* at 9:1–3; 12:2–5.) In contrast, other (non-real-time) versions use "standard Internet email client[s], such as Microsoft Outlook, Pegasus Mail, Eudora mail, or Lotus Notes." (*Id*. at 6:10–13.)

SendSig's Amended Complaint identifies just one claim—claim 1—that Square allegedly infringes, but all claims are substantially similar. All claims require a "real-time electronic messaging system" and a "real-time messaging server" and therefore are directed to the "Real Time Server Version[s]." Claim 1 is exemplary:

1. A real-time electronic messaging system comprising:

    (a) a server component operable on a server computer on a network with a real-time messaging server for receiving an electronic message sent from a sender and sending it to a recipient to whom it is addressed,

    (b) a remote client device for the sender connectable to the server computer through an online data connection to the network, and a client component operable on the remote client device for setting up a graphical data capture area in a visual interface of the remote client device, said client component including a graphical input device that is operatively coupled to the graphical data capture area for allowing the user to enter handwritten or handdrawn input through the graphical input device, and for capturing the handwritten or handdrawn input as graphical data and sending it as an electronic message to the server component via the network for sending to the recipient addressed, and

    (c) at least another remote client device for the recipient connectable to the server computer through an online data connection to the network, having a utility for receiving the electronic message sent to the recipient by the server component and viewing it as a handwritten or handdrawn message.

### III.   The '249 Patent's Claims Are Not Eligible for Patent Protection Under the Supreme Court's Two-Step *Alice* Test.

Section 101 of the Patent Act defines the scope of subject matter eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . ." 35 U.S.C. § 101. But the Supreme Court has held "for more than 150 years" that "[l]aws of nature, natural phenomena, and abstract ideas" are not patent eligible under § 101. *Alice*, 573 U.S. at 216 (citing *Ass'n for Molecular Pathology v. Myriad Genetics, Inc*., 569 U.S. 576, 589 (2013)); *Bilski v. Kappos*, 561 U.S. 593, 594, 601–02 (2010)); *see also O'Reilly v. Morse*, 56 U.S. 62, 112–20 (1853); *Le Roy v. Tatham*, 55 U.S. 156, 174–75 (1852).

To determine whether patent claims are ineligible for patent protection, courts use a two-step approach mandated by the Supreme Court in *Alice*. 573 U.S. at 217–18. At step one, a court asks whether the claims are directed to a patent-ineligible idea. *Id*. If so, the court turns to step two, and asks whether the claims add an "inventive concept"—that is, an additional element or elements that are "significantly more" than the idea itself and "transform" the claim. *Id.* at 217–18, 221–22. If a claim is directed to an abstract idea under step one and lacks an inventive concept at step two, it is ineligible under § 101 and invalid. Here, the claims of the '249 patent are directed to the abstract idea of sending and receiving handwritten messages over a network and lack an inventive concept to save them from ineligibility.

7

### A.   Step One: The '249 Patent Is Directed to the Abstract Idea of Sending and Receiving Handwritten Messages over a Network.

At step one of the analysis, courts determine if the asserted claim as a whole is directed to an abstract idea, rather than a concrete invention. This is determined by "look[ing] at the focus of the claimed advance over the prior art"—i.e. what purportedly makes the claims inventive over existing technology and devices. *Chamberlain*, 935 F.3d at 1346; *see also Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*, 173 F. Supp. 3d 1324, 1330 (N.D. Ga. 2016) (explaining that, at step one, the "trick is to try and detect the beating heart of the patent, its animating function" (citing *Bancorp. Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir. 2012)). To determine whether the identified focus of the claims is abstract, courts use common law reasoning: They compare the claims at issue with claims previously found to be directed to an abstract idea. *Chamberlain*, 935 F.3d at 1346–47.

Here, the focus of the claims, and their "claimed advance" over the prior art, is obvious from the get-go: the idea of sending and receiving handwritten messages over a network. All of the claims focus on that idea, broken into the self-evident steps of: (1) capturing handwritten information; (2) transmitting that information, via a network, to a recipient; and then (3) receiving the information and viewing it. (*See, e.g.*, '249 patent at claim 1.)[4] The specification similarly explains that prior art

---

[4] Claim 1 is representative of all claims in the '249 patent for a § 101 analysis be-

electronic devices for capturing handwriting "have not been enabled for electronic messaging," (*id.* at 1:52–56), and that the claimed invention is "an electronic messaging system that allows people to communicate with their own handwriting or drawing, as contrasted to typed text." (*Id.* at 2:12–14; *see also id.* at 1:18–19.)

The Court must next compare the focus of the '249 patent's claims—sending and receiving handwritten information over a network—to the focus of other claims found to be abstract. The Federal Circuit repeatedly has held that claims similarly directed to the idea of sending and receiving information over a network, including graphical information, are abstract. *See, e.g.*, *Two-Way Media*, 874 F.3d at 1337 (holding that claims regarding real-time streaming of media content were directed to the "abstract idea of (1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information"); *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (holding that claims to "wirelessly communicat[e] regional broadcast content to an out-of-region recipient" were directed to the abstract idea of "providing out-of-region access to regional broadcast content"); *see*

---

cause they are "substantially similar and linked to the same abstract idea." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 n.9 (Fed. Cir. 2016). Dependent claims 1 and 11 are essentially identical to one another, and the other claims add only insignificant, conventional elements. Moreover, the Court need not "individually address claims not asserted or identified by the non-moving party. . . ." *CG Tech. Dev., LLC v. William Hill U.S. Holdco, Inc.*, 2019 WL 4055000, at *2 (D. Del. Aug. 28, 2019) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014)).

*also Chamberlain*, 935 F.3d at 1347 (holding that claims directed to wireless sending and receiving of status information about a garage door were abstract); *Chargepoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 770 (Fed. Cir. 2019) (holding that claims directed to transmitting status information about electric vehicle charging stations were directed to "the abstract idea of communication over a network to interact with network-attached devices").[5] Thus, the claims here are likewise abstract.

There is also a second reason these claims are directed to an abstract idea. The Federal Circuit has explained that claims are directed to an abstract idea when they say *what* is accomplished without identifying *a concrete way* of accomplishing it. *See, e.g.*, *Two-Way Media*, 874 F.3d at 1337 (claims that required "functional results of 'converting,' 'routing,' 'controlling,' . . .'" but lacked description of "how to achieve these results in a non-abstract way" were directed to an abstract idea). In patent jargon, those claims are said to be functional—*i.e.* they describe the *result*

---

[5] District courts around the country have likewise held that sending and receiving information is abstract. *See Encoditech LLC v. Qardio, Inc.*, 2019 WL 2526725, at *4 (D. Del. June 19, 2019) (holding that claims regarding sending encryption keys for secure wireless communication between mobile devices were directed to "the abstract idea of establishing a secure wireless communication link and sending and receiving encrypted messages"); *Orcinus Holdings, LLC v. Synchronoss Techs., Inc.*, 379 F. Supp. 3d 857, 873–74 (N.D. Cal. 2019) (holding that claims regarding storing data on a computer, sending the data "across a mobile network to a server," and retrieving the data were directed to "the abstract idea of transmitting and retrieving data"); *Uniloc USA Inc. v. LG Elecs. USA Inc.*, 379 F. Supp. 3d 974, 990 (N.D. Cal. 2019) (patent claiming an alleged improvement to wireless Bluetooth technology through adding an additional inquiry field to improve response time was directed to "the abstract idea of additional polling in a wireless communication system").

(the function performed), rather than the actual *means* for achieving that result. *Am. Axle and Mfg., Inc. v. Neapco Holdings LLC*, 939 F.3d 1355, 1364–65 (Fed. Cir. 2019) (collecting Federal Circuit cases affirming that functional claims are directed to an abstract idea and ineligible under § 101); *see also Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d 733, 737–40 (D. Del. 2018) (Bryson, J., sitting by designation) (collecting cases that identify functional language as an indicia of abstraction because such claims "recite the concept, but not the way to implement it").

Every element of claim 1 of the '249 patent consists entirely of functional language. The claim elements list a "component" or "device" "for" achieving a certain function—like "receiving," "sending," or "capturing"—without reciting a specific way to accomplish the function. For example, claim 1 recites a "client component" "for capturing handwritten . . . input and sending it as an electronic message." ('249 patent at claim 1.)[6] These elements, like those in *Two-Way Media*, "require[] . . . functional results . . . but do[] not sufficiently describe *how* to achieve these results in a non-abstract way." 874 F.3d at 1337 (emphasis added); *see also Am. Axle*, 939 F.3d at 1363–65. Without any specific descriptions of *how* those results are accomplished, the claims are directed only to an idea rather than a specific implementation.

---

[6] Or a "client component" "for setting up a graphical data capture area in a visual interface of the remote client device." (*Id*.) Or a "graphical input device" "for allowing the user to enter handwritten or handdrawn input through the graphical input device, and for capturing the handwritten or handdrawn input as graphical data and sending it as an electronic message." (*Id*.)

The '249 patent's claims stand in stark contrast to claims the courts have found not to be directed to an abstract idea. For example, in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313–16 (Fed. Cir. 2016), claims that were directed to improving an existing process for lip-synching animated characters using "specific" rules that permitted automation (the existing system was manual-only, and tedious) were not directed to an abstract idea. In *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016), the claims were directed to a new type of database that improved the way computers stored and retrieved information. And in *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019), the claims were directed to a "specific implementation" of an improvement to "an existing technological process (i.e., error checking in data transmissions)"— which the claims improved by "varying the way check data is generated" and thus improved the ability to detect a particularly elusive type of error. This narrow line of cases—addressing claims directed to a specific improvement to an existing technology—is inapposite. As in *Chamberlain*, 935 F.3d at 1347, which addressed claims directed to a garage door opener that could wirelessly transmit status information, the claims here are "not limited to a specific implementation of a technological improvement to communication systems." As explained directly above, no "specific means or method[s]" are claimed at all. Instead, the claims simply combine "off-the-shelf technology [used] for its intended purposes"—here, routine electronic messaging and graphical capture technologies—and, as in *Chamberlain*, "no []

changes" were made to those technologies other than combining known systems to solve a non-technological problem, *i.e.* the desire to send and receive handwritten messages. *Id.* at 1347–48 ("[T]hat the claimed invention transmits data wirelessly and therefore does not rely on a wired path is not itself a technological improvement, but rather simply a feature of wireless communication . . . .").

In sum, the '249 patent's claims are directed to an abstract idea for two independent reasons. First, they are directed to sending and receiving handwritten information over a network, which is well-established by the Federal Circuit as an abstract idea. Second, they use functional language to describe the alleged invention, which demonstrates they are directed to abstract results rather than a concrete way of achieving them.

### B.   Step Two: The Claims Lack Any "Inventive Concept" That Is Significantly More Than the Abstract Idea Itself.

Step two of the *Alice* analysis requires searching the claims for an "inventive concept"—*i.e.* "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18 (emphasis added). Courts thus "look more precisely at what the claim elements add," *Epic IP*, 351 F. Supp. 3d at 736, and ask two distinct questions:

> (1) whether each of the elements in the claimed product (apart from the [abstract ideas] themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field; and

13

(2) "whether all of the steps as an ordered combination" add something "that is not already present when the steps are considered separately."

*Chamberlain*, 935 F.3d at 1349 (quoting *Mayo*, 566 U.S. at 73, 79) (internal quotation marks and citations omitted). "Simply appending conventional steps, specified at a high level of generality, [i]s not enough to supply an inventive concept." *Id.* at 1348 (quoting *Alice*, 573 U.S. at 222) (alteration in original). And the "inventive concept must be evident in the claims," meaning features described in the specification but not captured in the claims are irrelevant. *RecogniCorp, LLC v. Nintendo Co. Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017). Here, there is no inventive concept in either the individual claim elements or any combination thereof.

### i. The individual elements do not add an "inventive concept" because each involves well-understood, routine, and conventional activity.

At most, the elements of claim 1 add to the abstract idea of sending handwriting: (1) using a server with remote client devices; (2) sending the handwriting using real-time messaging; and (3) using a "graphical data capture area" on the client computer to display the handwriting inputted via a "graphical input device" before it is captured. ('249 patent at 15:59–17:6.) But the patent itself says that these additions comprise well-understood, routine, and conventional activities performed by generic computer technology. They therefore do not qualify as "inventive concepts."

**It was well-understood, routine, and conventional to use a server and remote client devices for communication.** The patent does not claim to have invented a new kind of "server computer" or "remote client device." To the contrary, the

14

specification explains that the claimed "server computer" is conventional. ('249 patent at 3:62–65 ("The term 'server computer' is used to refer to *any* type of data processing device that is connected to a node on a network for providing services to client devices on the network.") (emphasis added).) And the "remote client device" is *any* computing device. (*Id.* at Abstract ("[T]he remote client device can be a wireless PDA, always-on pager or messaging device, or mobile phone with SMS or EMS service."); *see also id.* at 3:48–51 ("The term 'client computer' refers to any computer capable of connecting to a server computer on a network and performing a function with the server computer.").) Courts have repeatedly confirmed that server/client components are generic and conventional. *See, e.g.*, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015) (rejecting as conventional at step two "a generic web server with attendant software, tasked with providing web pages to and communicating with the user's computer"); *Fitbit, Inc. v. AliphCom*, 233 F. Supp. 3d 799, 812 (N.D. Cal. 2017) (generic recitations of server-client communications cannot provide inventive concept).

**It was well-understood, routine and conventional to use real-time messaging.** The patent also concedes—as it must in light of instant messaging apps like AOL Instant Messenger and Yahoo! Messenger, well-known at the time of the '249 patent—that real-time messaging was conventional. (*Id.* at 10:56–65 (describing an existing "real-time server" that can be accessed "through an Internet Wireless Service Provider" with "PDAs and mobile communication devices"); *see also id.* at

15

11:36–38 (identifying that "real time communication systems" such as "instant messaging systems" were known in the art); *supra* pp. 4–6 (describing known real-time systems); *In re Chrona*, 656 Fed. App'x 1016, 1021 (Fed. Cir. Aug. 10, 2016) ("instant messaging" is a "conventional step[], specified at a high level of generality").)

**It was well-understood, routine, and conventional to use a "graphical data capture area" on the client computer to electronically capture handwriting with a "graphical input device."** The patent similarly does not claim to have invented "graphical input devices" or using a "graphical data capture area" to display handwriting before capturing it as a digital file. Instead, the specification names specific, *known* "graphical input devices" that were commonly in use with programs like Microsoft Paint to enter and electronically capture handwritten or hand-drawn content: "The graphical input device can be a touch screen, pen input device, stylus pad, or even a standard mouse." ('249 patent at 2:58–60; *see also id.* at 4:25–32 ("Examples of such input devices include the Wacom Graphire™ pen tablet . . . [or a] pen device . . . integrated with a touch screen, e.g., as also offered by Wacom.").) These devices conventionally used a "handwriting (e.g. stylus) data capture area" so users could see what they were drawing/writing and then capture it by saving it as a graphical file. (*Id*. at 11:2–3.)

Accordingly, the individual claim elements are not "inventive concepts" because the specification clearly identifies these elements as well-understood, routine, and conventional activities performed by generic computer technology.

### ii. The ordered combination fails to add an inventive concept.

As part of the *Alice* step two analysis, the Court must also examine the ordered combination of elements to determine if it adds an "inventive concept" to the abstract idea. Here, the ordered combination adds nothing to the idea of sending and receiving handwritten messages over a network. Indeed, the order simply is the abstract idea itself—*i.e.*, capturing handwriting, sending it over a network, and then receiving it as an electronic message. It is axiomatic that the "inventive concept" cannot be the idea itself. *See Chamberlain*, 935 F.3d at 1349 ("Wireless communication cannot be an inventive concept here, because it is the abstract idea that the claims are directed to.").

SendSig does allege that "[t]he particular combination of claims elements recited in claim 1 of the '249 Patent was not well-understood, routine, or conventional to a skilled artisan in the relevant field at the time of the inventions." (D.I. 17 ¶ 76.) But as discussed in detail below, this allegation is not entitled to any weight because the claims and patent specification contradict it and because it is wholly conclusory. *See infra* pp. 20–22.

Even if credited, this allegation fails for the same reasons articulated in *Chamberlain*, 935 F.3d at 1349. There, the patent owner argued that even if the individual elements were well-understood, routine, and conventional, the ordered combination was not. *Id.* at 1348–49. The Federal Circuit explained that simply combining well-understood, routine, and conventional components in a new way could not create an

"inventive concept." *Id.* Instead, to qualify as an "inventive concept," the ordered combination must add something to the abstract idea "not already present when the steps are considered separately." *Id.* at 1349 (quoting *Mayo*, 566 U.S. at 79).

Here, SendSig's Amended Complaint does not, and cannot, allege the order of capturing, sending, and receiving handwritten messages adds something not already present in the individual elements. Instead, the patent concedes that the ordered combination of capturing, sending, and receiving handwritten messages was well-known. *See supra* pp. 15–17.

SendSig's Amended Complaint also does not allege that the *combination* of these well-understood, routine, and conventional elements has been rearranged in an inventive way to solve an identified, technological problem. *Cf. BASCOM Global Internet Servs, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349–50 (Fed. Cir. 2016) (holding as meeting *Alice* step two a patent that "describe[d] how its particular arrangement of elements [wa]s a technical improvement over [the] prior art" because of the unique way it combined "generic computer, network and Internet components" to solve an identified technical problem with existing systems). Here, generic network and messaging components are ordered in the claims to perform their well-known, routine, and conventional functions. This case is like *Chamberlain*, where the Court found no inventive concept in claims directed to sending a particular type of information because the claims used known technology—a wireless network—implemented using conventional components in their conventional order. 935 F.3d

at 1349. Here, as in *Chamberlain,* the '249 patent is directed to sending a particular type of information using a known technology—instant messaging—implemented using conventional components in their conventional order. Thus, like *Chamberlain*, there is no inventive concept in the individual elements or in the elements' ordered combination.

In sum, the '249 patent thus should be dismissed on the pleadings as patent ineligible under § 101 because it is directed to the abstract idea of sending and receiving handwritten messages over a network and fails to add an "inventive concept." The individual elements were well-understood, routine, and conventional in the field, and the ordered combination adds nothing more. This conclusion is readily supported by the patent's claims and the specification.

### C. The '249 Patent's Ineligibility Under § 101 Can and Should Be Resolved on the Pleadings.

Patent ineligibility under § 101 is a question of law that is routinely resolved on a 12(b)(6) or (c) motion. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *see also Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.").[7] The Court should do the same here.

---

[7] Cases from this Court are in accord. *See Valentine Commc'ns, LLC v. Six Continents Hotels, Inc.*, 389 F. Supp. 3d 1223, 1233 (N.D. Ga. 2019) (Ray, J.) (granting Rule 12(b)(6) motion to dismiss for failure to claim patent-eligible subject matter under § 101); *TAGI Ventures, LLC v. Turner Sports Interactive, Inc.*, 2017 WL

There is no issue of fact that precludes dismissal. Courts defer determining § 101 eligibility on the pleadings only when two things have occurred: (1) a plaintiff has presented "plausible factual allegations" that elements of the challenged claims were not well-understood, routine, and conventional, and thus may qualify as "inventive concepts" at *Alice* step two, and (2) "nothing on th[e] record . . . refutes those allegations as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Neither is present here.

First, SendSig's Amended Complaint offers only conclusory allegations that certain claim elements were "not well-understood, routine, or conventional to a skilled artisan in the relevant field at the time of the invention of the '249 Patent." (D.I. 17 ¶¶ 77–79.) More specifically, and despite having previewed Square's ineligibility arguments in its original motion to dismiss, SendSig's Amended Complaint musters only three, conclusory allegations[8] that various elements in its claims were not well-understood, routine, or conventional: (1) "[u]sing a server with remote client devices to transmit handwritten content as digital data," (2) "[h]aving a remote client device . . . connectable to a server . . . that could receive an electronic message and view handwritten content digitally," and (3) "[c]onverting digitally displayed

---

3469528, at \*10 (N.D. Ga. Feb. 17, 2017) (Cohen, J.) (same); *Automated Tracking Solutions, LLC v. The Coca-Cola Co.*, 223 F. Supp. 3d 1278, 1292 (N.D. Ga. 2016) (Duffey, J.) (same for Rule 12(c) motion for judgment on the pleadings); *Mobile Telecomms. Techs.*, 173 F. Supp. 3d at 1336 (same).

[8] In addition to the similarly conclusory combination allegation addressed above. *See supra* at pp. 17–18.

handwritten content to a graphical data attachment to an email." (D.I. 17 ¶¶ 77–79.) Such conclusory allegations are a nullity because they include no facts to support the conclusion that the identified features were not well-understood, routine, or conventional. *Cellspin Soft, Inc. v. FitBit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019) (explaining that only "plausible and specific factual allegations" can create an issue of fact regarding an alleged "inventive concept").

Second, as shown above, the patent's specification contradicts these conclusory allegations. *See supra* pp. 15–17; *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) ("In ruling on a 12(b)(6) motion, a court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification.").

When there are no plausible, specific factual allegations, or when the allegations are contradicted by the patent, courts dismiss with prejudice on the pleadings. *See, e.g.*, *Valentine*, 389 F. Supp. 3d at 1232–33 (granting Rule 12(b)(6) motion where the "patent specifications admit that the computer components used to carry out the claimed invention are well-known, conventional, and routine components" and any "legitimate factual dispute" was "foreclosed"); *Citrix Sys., Inc. v. Avi Networks, Inc.*, 363 F. Supp. 3d 511, 520 (D. Del. 2019) ("'[I]n a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute.'") (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d

1354, 1356 (Fed Cir. 2018)). SendSig's allegations are insufficient to prevent dismissal on the pleadings, and the Court should grant Square's motion.

## IV.   Square's Point of Sale System Does Not Infringe the '249 Patent.

SendSig's Complaint also fails because it does not state a claim that Square's POS system infringes the '249 patent. To state a claim for patent infringement, a plaintiff must plead facts showing that every element (often called a "limitation" in patent jargon) is found in the accused product. *See, e.g.*, *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 858 (Fed. Cir. 2014). If any claim limitation is absent, there is no infringement as a matter of law. *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). Here, SendSig does not, and cannot, allege that Square's POS system is a "real-time electronic messaging system" that uses a "real-time messaging server." ('249 patent at 15:59–61; *id.* at 17:43, 18:8.)

The written description of the '249 patent identifies five different "Versions." ('249 patent at 5:14–18.) Only one of these versions—the "Real Time Server Version"—is at issue in the '249 patent. That is not unusual. A patent's written description often describes several different versions of an alleged invention, but each patent application must be limited to a single "independent and distinct invention[]" as defined by the patent claims. 35 U.S.C. § 121. Thus, applicants are permitted to file other applications—with the same written description—claiming any other, distinct versions of the alleged invention not claimed in the first application. That is exactly

what happened here. The patentee's first application claimed Version (4): the "Internet Email Server Version." (*See* U.S. Patent No. 6,304,898.) The second application, for the '249 patent, addressed only Version (3): the "Real Time Server Version." That version is discussed in two, specific portions of the specification and is distinguished from the remaining, non-"real time" "embodiments." ('249 patent at 8:22–9:10; *id.* at 10:55–12:36.) Figure 4B is the only depiction of the Real-Time Server Version:



Figure 4B shows that both client devices are directly connected to the real-time server. Specifically, the server 420 has a real time "java server" software 420a, and the two clients—the receiving and sending devices 410 and 430—have "java client" software 410a directly connected to the server software. The patent explains that this direct connection is required so that software on each client computer can "poll" the server for messages and receive them in real-time. (*Id.* at 9:1–3 (explaining that real-time communications require software on each client to "poll" the real-time server for messages); 12:2–5 (same).)

This makes sense: A direct server connection is necessary for a real-time messaging system to work. The client devices must be connected, and logged on to, the

real-time server so that users are visible to each other, can initiate conversations, and can communicate "instantly." (*See id*. at 11:5–15.) As the patent recounts, real-time messaging systems at the time of filing—such as the AOL Instant Messenger and Yahoo! Messenger services—were services in which a user logged on to, and established a direct connection with, a real-time server so that they could "initiate a private, real time communication session" with other users. (*Id.* at 11:23–26; *see also id.* at 11:16–18 (explaining that the "real-time server version allows people to communicate privately and personally by instantly sending handwriting").)

In contrast, SendSig alleges that Square allows purchasers to request a receipt via standard email, *i.e.* using "their personal email services," which has no direct connection between the alleged "real time server" and at least one client device— the recipient's personal device. (D.I. 17 ¶ 57). According to the Amended Complaint, the Square POS system is the server 420, the Square POS at the merchant site is the sending "Client Computer" 410, and the receiving "Client Computer" 430 is the recipient's personal device on which the user receives email. The sending computer and the Square POS (the "server," according to the Complaint) have Square software installed and are directly connected. But according to SendSig, the Square POS system (the "server," according to the Complaint) sends an email to the "personal email service['s]" server (for example, a Gmail server). (D.I. 17 ¶ 57.)  That server then delivers the email to the recipient. SendSig does not, and cannot, allege

that the recipient's device has any software installed that directly connects it to the Square server and polls it for messages, as required for real time messaging.

Thus, SendSig has not pleaded, and cannot plausibly plead, that Square's POS system is a "real-time electronic messaging system" that uses a "real-time messaging server." ('249 patent at 15:59–61; *id.* at 17:43, 18:8.) The Court's role, as gatekeeper to the Courthouse, is to use its "judicial experience and common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), to dismiss claims, like those here, that lack a plausible basis for alleging infringement. That is what numerous other judges have done when a complaint shows that there is no infringement: They have dismissed the case, on the pleadings, with prejudice. *See, e.g.*, *Ottah v. BMW*, 230 F. Supp. 3d 192, 197 (S.D.N.Y. 2017), *aff'd sub nom. Ottah v. Fiat Chrysler*, 884 F.3d 1135 (Fed. Cir. 2018) (dismissing claims on Rule 12(b)(6) motion with prejudice where the pleadings show there is no infringement); *see also ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 793–95 (D. Minn. 2019) (denying motion to amend after complaint was dismissed because Plaintiff cannot contradict the admissions it made in its original complaint). The Court should do the same here.

## V.   Conclusion

Because the '249 patent is directed to an abstract idea and fails to add any significant element or combination of elements to transform the claim, and because the Complaint fails to plausibly allege that Square infringes the '249 patent, the Court should dismiss the Complaint with prejudice.

December 11, 2019

Respectfully submitted,

*s/ Todd E. Jones*

Theodore J. Angelis, *pro hac vice*
*theo.angelis@klgates.com*
Elizabeth J. Weiskopf, *pro hac vice*
*elizabeth.weiskopf@klgates.com*
Nicholas F. Lenning, *pro hac vice*
*nicholas.lenning@klgates.com*
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580
(206) 370-6006 (fax)

Todd E. Jones (No. 403925)
*tjones@taylorenglish.com*
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
(770) 434-6868
(770) 434-7376 (fax)

Counsel for Defendant
Square, Inc.

26

## <u>LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief has been prepared in 14 point Times New Roman font in accordance with Local Rule 5.1(C).

*/s/ Todd E. Jones*
Todd. E. Jones
Georgia Bar No. 403925
